Mr. Bromowski, yes, you may proceed. Good morning, your honors, and may it please the court. My name is John Bromowski, and I represent the defendant in this case, the appellant Marcell Shavers, who is a 29-year-old young man who has been in custody since 2016. And unless this court takes action to correct what I believe is an unjust conviction, he will remain in custody for the remainder of a 40-year sentence for a conviction for possession with intent to distribute methamphetamine, 5 grams or more, in violation of 21 U.S.C. 841a1b1b and 846. I've made several arguments, obviously, in my brief trying to preserve issues for this court's consideration. Where I would like to start, however, is the sufficiency of the evidence argument that I made for a couple reasons. Number one, as this court knows, if you find that there was not sufficient evidence to convict, then you don't have to address the other issues that were raised in the brief. Moreover, if we start there, then it provides context to the later jury instruction arguments that are available for this court's consideration. Now, there's a couple standards of review because the way I raised the issue was, one, I said that the district court erred in overruling our motion for judgment of acquittal at the close of the government's evidence and then at the close of the case. And then it later erred in overruling our motion for a new trial. As to the judgment of acquittal, sufficiency of the evidence argument is reviewed by this court de novo, meaning you can start over again and pay attention to what is argued and what the record shows. The government is given the benefit of the light most favorable to their case, and the standard is whether or not any rational prior of fact could find the elements of the charged crime. As to the motion for new trial, the sufficiency of the evidence is for abuse of discretion, and you need not this time look and give the government the benefit of the light most favorable to its case, and you may reevaluate the evidence and evaluate credibility. Now, possession with intent as instructed in this case said that two or more persons reached an agreement or understanding to possess with intent to distribute methamphetamine, and that will be important. Then second element is that Shavers voluntarily and intentionally joined in the agreement or understanding. Third, that at the time Shavers joined, the purpose of the agreement, or I'm sorry, at the time he joined, he knew the purpose of the agreement or understanding. And then fourth is just that the drug amount involved in methamphetamine was five grams or more. Now, the purpose of the agreement or understanding in this particular case is that there has to be an intent to distribute methamphetamine. And it's important because the controlled substance in this case is just not any controlled substance. It is methamphetamine. The government failed to prove either proposition. With regard to the intent to distribute, the government must prove either that Milton and Roberts, Milton being the person who sold drugs to Roberts or had agreed to sell drugs to Roberts, who's co-defendant in the case, that Milton and Roberts conspired to possess with intent to distribute, or that Roberts and Shavers, my client, conspired to possess with intent to distribute methamphetamine. As to Milton and Roberts, the only thing the government proved is that there was a buyer-seller relationship between the two of them. Mr. Milton was very clear that he knew nothing of Roberts, Shavers, Wilson, who's a third co-defendant in the case. He knew nothing of them before the day in question. He met Roberts, who asked him whether or not he had blast to sell, which was a misinterpretation of a phrase that describes methamphetamine. Milton clarified with him, do you mean ice methamphetamine? And Roberts said yes. And they agreed at that point that perhaps Milton could later provide methamphetamine to Roberts. A conspiracy requires a common purpose. A mere act to sell what one person has to offer to a person who agrees to buy it is simply buyer and seller. There is no conspiracy to possess with intent to distribute without more. And this case does not have that without more. Now, the government insists that Roberts is a distributor of methamphetamine, but they did nothing to prove that at trial. The drug weight involved, they argue, is sufficient to show that there was a conspiracy to show the intent to distribute because they say it's distribution weight. But what they did is they failed to provide expert testimony that would allow a jury to decide whether or not it was user weight versus distribution weight. They cite several cases in their brief in response to the appellant brief. And as I pointed out on page two of my reply brief, each one of those cases they cite not only had an expert witness testifying that the amount was more likely than not distribution weight versus user weight, but they also had other indicia of conspiracy such as they had baggies, they had other drugs, they had guns, they had large amounts of cash. All these other indicia of distribution that are not in our case. When the government's law enforcement agents went and executed a search and arrest of Mr. Roberts, they searched his townhouse and all they found was a weapon and some personal use marijuana. They didn't find any of this other indicia of drug conspiracy of any drugs at all. In fact, the only reason that we know or we think we know that Roberts was a drug distributor is because Wilson said he is. There is no other evidence in this case that shows that he did any distribution. Again, there was no indicia of drug conspiracy or drug distribution found on him at time of arrest or at his apartment where he supposedly carried out these transactions. Counsel, I thought that the record shows that Shavers drove around with Wilson and Roberts selling meth prior to the transaction at issue. What it does show, Your Honor, is that at some point in the evening, after it became dark, but before the time of the drug distribution with Milton, it shows that they went and picked up Shavers at Wilson's mother's house and then they drove around. Wilson at that time was selling methamphetamine, not either one of the other two. They just happened to be present while he was doing his thing. The reason, one of the reasons we know this is because he specifically testified, Wilson specifically testified at trial that he and Roberts had their own things going. They did not interact. Wilson sold methamphetamine. Roberts sold only cocaine and crack cocaine. They did not share in profits. They did not share customers. They did not share people that were selling the drugs to them. They were merely friends who hung out together. They had their own things going on. So Milton is the one driving around selling methamphetamine at that time, not Roberts. In any event, they also mentioned the fact, the government also mentioned the fact that there was a scale at the apartment complex where the drug sale was supposed to go on between Milton and Roberts. That scale, however, belonged to Milton and that was his testimony. Again, no other indicia of drug sales associated with Roberts. Now on the other side of that, I said you either had to show a conspiracy between Milton and Roberts to distribute or you had to show a conspiracy between Roberts and Shavers to distribute. The way the government tries to show that there is a conspiracy to distribute between Roberts and Shavers is they rely on the testimony of Wilson's mother, Amita Jackson. She testified that in the afternoon prior to when Wilson and Roberts came and picked up Mr. Shavers at her house that Roberts was blowing up, quote unquote, blowing up Marcel Shavers' phone. Number one, the jury completely discredited Ms. Jackson and her daughter's testimony. They necessarily had to in order to say that my client was not guilty of the murder he was charged with in count two of the indictment. More importantly, though, the government had physical, actual evidence that they presented to the jury in the form of the phone records belonging to Wilson and Roberts. And those phone records do not show the existence of any of those phone calls or any of the text messages that were supposedly blowing up Mr. Shavers' phone. So she says that the phone was blowing up. The phone records from those two gentlemen show that she is lying. Furthermore, I specifically cross-examined three of the detectives who investigated this case during the trial. Detectives Fogle, Nelson, and Martin, all three of them agreed that when they reviewed the phone records when they first were conducting their investigation, that there was no record of any phone calls or text messages between Roberts and my client, Mr. Shavers. So that the only time that this, the only time that they could have determined that there was a conspiracy, that there was some sort of communication between Roberts and Shavers, was when they were picked up in the car and they were driving around. But again, as the record reflects, Roberts said to Milton, I got to go to the liquor store real quick and holler at that dude from earlier. From that, the government argues that my client must have known not only that he was going to do a drug deal, but that Roberts was going to buy drugs from Milton for the purpose of redistributing them elsewhere. He had to know the amount involved and he had to know that Roberts was going to meet with Milton, period. But Wilson himself, who was present earlier in the day when they first met, specifically testified that he didn't know if Roberts was going to buy drugs or sell drugs. He didn't know whether it was going to be marijuana or cocaine or methamphetamine. He did not know that, in fact, it was Milton that Roberts was going to meet. He just knew that he had to meet with someone back at the liquor store where they had met earlier in the day. And that is not sufficient to show that my client had knowledge in any way, shape, or form that there was going to be methamphetamine involved in this case and that it would furthermore be redistributed, especially since Mr. Roberts did not sell methamphetamine as his common practice. He only sold cocaine and crack cocaine. And I would like to reserve the remainder of my time if there are no questions. Very well. Mr. Hurst. May it please the Court, Ben Hurst for the United States. I'll also start with the sufficiency of the evidence here. But I would like to maybe take one step back from where my colleague was and take a look at what's at stake and what we're looking at. We're not looking at the question of, well, did the jury get the answer right here? Or we're not looking at the question, did the government disprove all alternative theories? Or were there alternative theories that might have been a rational jury could have found? Now the question that's before this Court is, could any rational jury have come to the same conclusion that this jury did? So we're not looking at evidence that wasn't in the case. We're looking at the evidence that was in the case, trying to see whether a jury could have convicted of possession with intent to distribute more than five grams of methamphetamine based on this record. And so I think it would be helpful for the Court to maybe take a short summary, a tour through the events in this case and what the evidence, giving all reasonable inferences to the verdict, shows. At the beginning of January, prior to these events, Shavers and Roberts were living together, were incarcerated together at the Cameron Prison, one door down from each other. And this is important to showing Shavers' motivation because later comes out in evidence that Shavers is joining with Roberts to help him to provide backup to a drug deal because he wants to help Roberts and to pay him back because Roberts helped him while they were incarcerated together. So on January 1st, Roberts goes to the, this is the first trip to the liquor store. He goes to the liquor store. He asks Milton out of the blue, can I buy some methamphetamine? Now, it's been oft discussed in this case. Well, Roberts says he's just a coke dealer. He doesn't deal methamphetamine. This is, he's setting up to buy an ounce or two ounces of methamphetamine. And as comes out later in the case, Roberts doesn't use methamphetamine. So he's going to spend $2,000, $1,000 on two ounces of methamphetamine, you know. And the inference that the defense wants to draw from this is that no rational jury can conclude that a guy who doesn't use methamphetamine wants to spend $2,000 on methamphetamine for some purpose other than possess it with intent to distribute it later. Further, at the liquor store, he goes and he asks Milton, hey, can you sell me some methamphetamine? He leaves. They have a set of phone calls to negotiate about quantity and price. He is then blowing up Shavers' phone. Now, the counsel wants to suggest to you that, well, you can't take anything that the mother or the sister said in their testimony about what Shavers said to them as true because, well, look, they must not have believed those witnesses because of the other count on which he was acquitted. But the fact that he was acquitted on some other count doesn't tell us anything about this count, and there's no inferences that the court could draw from that. And the question is maybe they would have believed him on some, or maybe there's some other element that the jury decided not to convict on, but it's not something that goes to whether a rational jury could have believed them on this point. What about the lack of messages or phone records on the cell phone that counsel highlighted? Well, Your Honor, I think that there's two responses to that. I looked through those transcripts. The transcripts are, it's a suggestion that they didn't find maybe there's correspondence between those two phone numbers, but it doesn't mean that there weren't additional phone numbers, and it doesn't mean that no rational jury could have believed the mother who says that Shavers was blowing up his phone. So the question is, is there an inconsistency in the evidence perhaps? But the fact is that the jury chose to convict based on this with the evidence that the mother gave, and this was explored during cross-examination. Counsel ably brought that up to the jury's attention. The jury reached the conclusion that it did. So at this point, Shavers' phone is being blown up by Roberts, and he's asked, he decides to go with Roberts. He later tells the mother, I wish I hadn't done that. That was a mistake. We didn't get no money. We didn't get no drugs, which is an indication of his state of mind at the time. The three of them are then driving around later in the afternoon, and they're selling methamphetamine. And I do want to point out from the transcript, it's not clear at this point that there's just Wilson selling it. And this is on the transcript, page 47. So the three of you, JR, that's Roberts, yourself and Marcel, yourself is Wilson. So JR, Roberts, and Marcel are in the car together, yes. You're still in this silver Hyundai, yes. And you said you drove around and made some more moves, yes. And again, for the purposes of clarity of the record, we're talking about selling drugs, yes. Okay, what kind of drugs were we talking about then? Methamphetamine. The thing about this is we know that Roberts is a drug dealer, and drug dealing is not like the difference between orthodontics and heart surgeons. There's not hyper-diversity here. They're at this point earlier in the day selling cocaine. Here, the jury could have concluded from this testimony that they were selling methamphetamine. Following these sets of transactions, they go back to the liquor store. Roberts and Milton leave together to go to Medellin's apartment and tell Shavers that he and Wilson should follow them to provide backup. At this point, they know they're going to a drug deal to provide backup. And at this point, when they drop him off, they travel to the quick trip, they drop off Shavers. Shavers is supposed to follow Roberts down to the apartment complex. And at this point, he's carrying the weapon that's ultimately used to murder Medellin. Following this, the testimony from the mother and the sister was that Shavers either hid or laid in the back of the truck from the, quote, Mexican. And then at some point, Roberts motioned for him to come into the apartment complex. He goes into the apartment complex where Shavers or Roberts, Milton, and Medellin have been negotiating the deal. At that point, there's the presence of firearms, scales, large amounts of cash, and two ounces of methamphetamine. And all the indicia that counsel suggests are lacking in this case are present right there. And a rational jury could have concluded from that evidence that what was going to be done there was not a buyer-seller transaction. And the thing that has not really been addressed in this case or in the arguments here is the buyer-seller is a seller of a drug to a user of a drug. It's not seller of a drug to someone who's going to resell the drug. And it's very clear from this case that this is a situation where these guys are going to possess this drug with intent to resell it, not for purposes of using it themselves. As we know, Roberts doesn't use methamphetamine. It's $2,000 of meth. A rational jury could come to the conclusion using their common sense that this is not a situation where they're going to reuse this drug themselves over the course of some period of time. Just to put a final on this, the factual summary, moving from here to the, there's a murder. A rational jury could have inferred that that was Shavers who moved in there, and that's in fact what the district court concluded at sentencing. And then after the shots are fired, Milton runs away. Shavers and Roberts run underneath the bridge under I-70 to the IHOP, and they call Wilson to come pick them up. And at that point, Wilson says, or Shavers is upset with Roberts because Roberts still has his gun, and Shavers no longer has his gun. He asks Wilson to take him back to the IHOP to find it, and that's ultimately where the police found the gun that was used to murder Medellin. So I think from the totality of the evidence that's presented to the jury, a rational jury could have come to the conclusion that Shavers joined with Roberts to possess methamphetamine with intent to distribute it. There are no additional questions on sufficiency. I would like to spend a couple of minutes talking about the constructive amendment issue. There's no constructive amendment in this case because there's no substantial likelihood that the jury convicted Shavers of some conspiracy that didn't also include Roberts. There's three points I'd like to make about this, three reasons why this court shouldn't find a constructive amendment here. First, I'd like to point the court to a case called Leahy, and the proposition I'd like the court to recognize from that is we need to look at the instructions as a whole, not just looking at the verdict-directing instruction that was a model, a use of the model here that says two or more persons, but looking at the entire set of instructions, including instruction number two. Instruction number two summarizes, perhaps not word for word, what the indictment says and says, look at the question for the jury here is did Roberts and Shavers conspire with each other to possess intent to distribute five or more grams of methamphetamine? And Leahy had a similar situation that arose here where the indictment had three names, three people conspired together, but at the trial and the instructions that were given similar to these said two or more persons conspired. And the court said, well, this isn't a constructive amendment because here the whole of the instructions, including the indictment that was given to the jury and the direction to the jury to only try the defendant for the crimes that are listed, all together, taken all together, focused the jury on who was really in the conspiracy. And that same reasoning can be applied to this case. Second, even if the court finds that as a whole the instructions somehow changed the names of the people in the indictment and notwithstanding the instruction to focus the jury on the two people who were named in the indictment, this court should look at a case called Johnson. And what Johnson tells us is the names of the people in the indictment themselves are not elements of the conspiracy charge. The elements of the conspiracy charge is what is the agreement. In the instructions, the names are there to help us identify what the agreement is. So in Johnson – So what if we can't follow Johnson because of an older case, U.S. v. Morton, 8th Circuit, 2005, which comes to an opposite conclusion? Your Honor, I have to say I'm not familiar with Morton. If, in fact, it comes to an earlier – if the case is on all fours and it comes to a different conclusion earlier, that would be the case you'd have to follow. Then the analysis would go to the substantial likelihood, wouldn't it? Yes, Your Honor. And the substantial likelihood question is a question that actually, I think, focuses primarily on what the facts are. Is there a way – if you find that this case could not have – that there was a constructive amendment here, is it still the case that the court or that the jury could have convicted him of some crime other than the one that was charged? And for that proposition, I direct the court to a case called Sion where the indictment said, taken by fraud, and the instruction said, stolen, converted, or taken by fraud. And the court said, well, the addition of those terms in the instructions didn't result in a constructive amendment here because the facts, all taken together, focused the jury on what was in the indictment. And here we have the same situation. We have no set of circumstances that the jury could have convicted him of, no conspiracy the jury could have convicted Shavers of that didn't also involve Roberts. So Roberts was the person who set up the drug deal. Roberts was the person who involved Shavers. Roberts was the person who asked Shavers to provide backup. And Roberts was the one who was interacting with Milton and Medain. And Roberts was the one who called Wilson to come and pick them up. So everyone who is in this circle of affairs, who's surrounding this drug deal that Roberts has set up, is somehow dealing with Roberts. And for that reason, there's no substantial likelihood here that the jury could have convicted Shavers of any crime or any conspiracy that didn't also involve Roberts. And so he was the indictment and there was no substantial likelihood that he was convicted of something that wasn't listed in the indictment. Thank you. There are no additional questions. I see that my colleague has been prepared to submit on the briefs the rest of the arguments that were raised. The government is willing to rest on its briefs. Likewise, unless the court has additional questions about arguments three or four or... All right. Thank you very much. We ask the court to affirm. Thank you. Mr. Gromowski, you have about three minutes. Touching briefly upon what was mentioned, a couple of things. Number one, the only person who says that my client wanted to help Roberts because he had been in prison together with Mr. Roberts was the mother. And again, the jury necessarily had to have found that she was lying to them, as was proven in court. And so she's not liable. And even if this court decides to take a look at her, you're allowed under the second standard for the motion of new trial to look at her credibility yourself. The other thing that the government argues now is that Roberts does not use methamphetamine. That is not what the record shows. This comes up in the laundry room where the drug deal was supposed to take place. And Mr. Roberts supposedly, according to Mr. Milton, asked about the quality of the drugs, at which time they offered to allow him to smoke the drugs with a meth pipe. He simply said, I don't smoke it. He didn't say that he doesn't ingest it otherwise. He didn't say he doesn't inject. He didn't say he doesn't snort. He doesn't say he doesn't swallow pills. He just says that I don't ingest it by smoking it. And so there is no this, I don't use methamphetamine, therefore it can't be personal use. And then on to the constructive possession with the last about a minute and a half I have here. Number one, I don't think you should consider the Leahy court because that's a Fifth Circuit case. It's not precedential here. Additionally, when talking about that or the Johnson case that was raised in the government's 28-J letter that they filed just about a week ago, it talks about the fact that the charging document in that case specifically mentions that the defendants that were charged in conjunction with other people that are known and unknown to the grand jury got themselves involved in a conspiracy to distribute. This case is distinct from that. This case specifically charges only two people. It charges Roberts and Shavers with a conspiracy to possess with intent to distribute methamphetamine. There is no, as I raised in my objection at trial, there is no additional people known and unknown to the grand jury. It's just the two of them. So when you change the charge that you give to the jury to say that any two people can conspire to distribute and you can still find my client guilty, then you've shifted the goalposts. You've allowed the jury to find an easier path to conviction, and that is in fact constructive amendment of the charge. It violates my client's Fifth Amendment right to have the grand jury charge an indictment, and it's per se prejudicial under the Eighth Circuit case law. And with that, I ask that this court either grant my client a new trial or reverse the conviction with instructions to the district court to dismiss the case. Thank you, Your Honors. Thank you, Counsel. And, Mr. Gromowski, I want to extend the thanks of the court to you for accepting the appointment in this case. Thank you, Your Honor. Does that conclude the calendar of cases for this morning? Yes, it does, Your Honor. Very well.